2005-NMSC-004

109 P.3d 285

**STATE of New Mexico, Plaintiff–Petitioner,**

v.

**Antonio GRAHAM, Defendant–Respondent.**

No. 28,286.

Supreme Court of New Mexico.

March 1, 2005.

Patricia A. Madrid, Attorney General, Patricia A. Gandert, Assistant Attorney General, Santa Fe, NM, for Petitioner.

John Bigelow, Chief Public Defender, William A. O'Connell, Assistant Appellate Defender, Santa Fe, NM, for Respondent.

*OPINION*

SERNA, Justice.

{1} Following a jury trial, Defendant Antonio Graham was convicted of, among other charges, child abuse, contrary to NMSA 1978, § 30-6-1 (2001). On appeal, the Court of Appeals affirmed Defendant's other convictions but reversed his conviction of child abuse on the basis of insufficient evidence. *State v. Graham*, 2003-NMCA-127, ¶ 3, 134 N.M. 613, 81 P.3d 556. This Court granted the State's petition for writ of certiorari to the Court of Appeals, and we now reverse.

## I. Facts

{2} Defendant lived at the residence of his girlfriend, Amanda Kelly, with their two children, ages one and three. On September 1, 2000, police sought to execute an arrest warrant for Defendant at Kelly's house. Police officers apprehended Defendant outside the house in a truck. With the consent of the owner of the truck, the officers found crack cocaine in a search of the truck. At that point, Kelly stepped out of the house and asked what was happening. The officers smelled a strong odor of burnt marijuana emanating from the house. They obtained a search warrant for the house. Inside, the officers found additional crack cocaine, several plastic bags with marijuana, a marijuana pipe, and a hanging scale in a dresser drawer in the master bedroom. The officers also noticed rolling papers and marijuana residue, including seeds and stems, on top of a different dresser. Additionally, the officers found a marijuana roach on the living-room floor in front of the sofa and a marijuana bud in a crib in the master bedroom. The officers also recovered a plastic sandwich bag with a small amount of marijuana just inside the front door on a table next to a fish tank. The officers saw two infants in the house and noticed that they were in diapers. The house was dirty and untidy, with soiled clothes on the floor throughout the house and unwashed dishes with old food on them. Along with various drug charges, the State charged Defendant with child abuse.

{3} At trial, Officer Lee Wilder testified that the bud is the most desirable part of the marijuana plant that people generally smoke. It is the part of the plant containing a high concentration of tetrahydrocannabinols. Officer Dusty Collins explained that marijuana dries in buds that are broken up and put in bowls or cigarettes to smoke. The bud found in the crib was in one solid piece with the stem.

{4} Kelly testified that she was unaware of the marijuana on the floor of the living room and in the crib. She stated that if the children had ingested the marijuana she believed that they would have become sick. Kelly testified that Defendant told her that the presence of the marijuana on the living room floor and in the baby's crib was his fault and that he was sorry. In response to a question about whether drugs were more important to Defendant than his children, Kelly recited Defendant's statement that his only thoughts were about drinking, smoking dope, selling drugs, and running the streets.

{5} Two witnesses testified that they were inside Kelly's house immediately before Defendant's arrest on September 1, 2000. These witnesses testified that while they were in the living room they saw Kelly's two children running around the house and playing. Officer Collins testified that the marijuana in the living room was accessible to the children. In addition, a photograph of the bud inside the crib was admitted as an exhibit.

## II. Standard of Review

{6} "[T]he test to determine the sufficiency of evidence in New Mexico ... is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sutphin,* 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). We have explained that this test involves two separate parts. *State v. Coffin,* 1999–NMSC–038, ¶ 73, 128 N.M. 192, 991 P.2d 477; *State v. Sanders,* 117 N.M. 452, 456, 872 P.2d 870, 874 (1994). First, "[a] reviewing court must view the evidence in the light most favorable to the state, resolving all conflicts therein and indulging all permissible inferences therefrom in favor of the verdict." *Sutphin,* 107 N.M. at 131, 753 P.2d at 1319. Second, an appellate court "determines whether the evidence, *viewed in this manner,* could justify a finding by *any* rational trier of fact that each element of the crime charged has been established beyond a reasonable doubt." *Sanders,* 117 N.M. at 456, 872 P.2d at 874 (emphases added).

{7} In setting out the standard for reviewing sufficiency of the evidence, the Court of Appeals stated that "the evidence and inferences drawn from that evidence must be sufficiently compelling so that a hypothetical reasonable factfinder could have reached 'a subjective state of near certitude of the guilt of the accused.' " *Graham,* 2003–NMCA–127, ¶ 12, 134 N.M. 613, 81 P.3d 556 (quoted authority omitted). It is indeed true that the standard of beyond a reasonable doubt has been described as "a subjective state of near certitude of the guilt of the accused." *Jackson v. Virginia,* 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This standard has also been described as being beyond "a doubt based upon reason and common sense—the kind of doubt that would make a reasonable person hesitate to act in the graver and more important affairs of life." UJI 14–5060 NMRA 2005. However, in articulating the reasonable doubt standard referenced by the Court of Appeals, the United States Supreme Court emphasized that an appellate court reviewing for sufficiency does not

ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.

*Id.* at 318–19, 99 S.Ct. 2781 (citation, quotation marks, and quoted authority omitted). We have used similar cautionary language: "A reviewing court may neither reweigh the evidence nor substitute its judgment for that of the jury." *Sutphin,* 107 N.M. at 131, 753 P.2d at 1319. Thus, the question is not whether this Court is convinced of Defendant's guilt beyond "a doubt based upon reason and common sense—the kind of doubt that would make a reasonable person hesitate to act in the graver and more important affairs of life." UJI 14–5060. Rather, the question is whether, viewing all of the evidence in a light most favorable to upholding the jury's verdict, there is substantial evidence in the record to support *any* rational trier of fact being so convinced. "[S]ubstantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . ." *State v. Lujan,* 103 N.M. 667, 669, 712 P.2d 13, 15 (Ct.App. 1985), *quoted in State v. Salgado,* 1999–NMSC–008, ¶ 25, 126 N.M. 691, 974 P.2d 661.

## III. Sufficiency of the Evidence

{8} We begin our review of the sufficiency of evidence to support Defendant's conviction with the elements of child abuse. For the form of the crime with which Defendant was charged, the State had the burden of proving beyond a reasonable doubt that

Defendant caused a child or children under the age of eighteen to be placed in a situation that may have endangered their life or health and did so with a reckless disregard. Section 30–6–1(A)(3), (D)(1). A reckless disregard requires that Defendant "knew or should have known [his] conduct created a substantial and foreseeable risk, [he] disregarded that risk and . . . was wholly indifferent to the consequences of the conduct and to the welfare and safety" of the child or children. UJI 14–604 NMRA 2005.

■ {9} By including endangerment in Section 30–6–1, the Legislature expressed its intent to extend the crime of child abuse to certain conduct even if the child has not suffered physical harm. *State v. Ungarten,* 115 N.M. 607, 609, 856 P.2d 569, 571 (Ct.App. 1993). "The [L]egislature's decision to criminalize the conduct described by the statute reflects a compelling public interest in protecting defenseless children." *Lujan,* 103 N.M. at 671, 712 P.2d at 17; *accord Santillanes v. State,* 115 N.M. 215, 219, 849 P.2d 358, 362 (1993). "[C]hildren, who are often times defenseless, are in need of greater protection than adults." *State v. Lucero,* 87 N.M. 242, 245, 531 P.2d 1215, 1218 (Ct.App. 1975). However, in designating the crime as, at a minimum, a third degree felony, Section 30–6–1(E), the Legislature did not intend to criminalize conduct creating "a mere possibility, however remote, that harm may result" to a child. *Ungarten,* 115 N.M. at 609, 856 P.2d at 571; *accord State v. Coe,* 92 N.M. 320, 321, 587 P.2d 973, 974 (Ct.App.1978) (rejecting the argument "that because of its negligence requirement the statute covers any and all harm that might befall the child"), *overruled on other grounds by Santillanes,* 115 N.M. at 225 & n. 7, 849 P.2d at 368 & n. 7. "There must be 'a reasonable probability or possibility that the child will be endangered.' " *State v. McGruder,* 1997–NMSC–023, ¶ 37, 123 N.M. 302, 940 P.2d 150 (quoting *Ungarten,* 115 N.M. at 609, 856 P.2d at 571) (quotation marks omitted).

■ {10} In reviewing the evidence relevant to the charge of child abuse, the Court of Appeals stated that there was "no direct evidence that the two children were ever close to the drugs that were found and no direct or circumstantial evidence that the presence of the drugs posed a direct and imminent threat of danger to them." *Graham,* 2003–NMCA–127, ¶ 26, 134 N.M. 613, 81 P.3d 556. We first note that direct evidence is not required. *State v. Bell,* 90 N.M. 134, 137, 560 P.2d 925, 928 (1977). We also disagree with this assessment of the evidence. With respect to proximity, two witnesses testified that, while in the living room, they observed the children running around the house immediately before the arrest and search. Officer Collins testified that the marijuana on the floor in front of the sofa was accessible to the children. In addition, a whole marijuana bud was found in a crib, a piece of furniture that functions as a sleeping area for an infant. We believe that this evidence supports a reasonable inference that the children were in the immediate vicinity of the marijuana, that it was accessible to them, and that there was a reasonable possibility that they would come in contact with the controlled substance. *See State v. Romero,* 79 N.M. 522, 524, 445 P.2d 587, 589 (Ct.App.1968) ("An inference is merely a logical deduction from facts and evidence.") (quoting *State v. Jones,* 39 N.M. 395, 401, 48 P.2d 403, 406 (1935)). The Court of Appeals indicated that there was no evidence that the crib was used for either child. *Graham,* 2003–NMCA–127, ¶ 21, 134 N.M. 613, 81 P.3d 556. However, the State introduced a photograph depicting the contents and state of the crib at the time of the incident. Two police officers testified that the crib was in the master bedroom and that the bud in the crib was found underneath a teddy bear. This evidence, as well as the inherent purpose of this piece of furniture and the ages of the children, supports a reasonable inference that the crib was being used as a sleeping area for at least one of the children. From the testimony that the officers did not see the bud until they picked up the teddy bear, and from the absence of any evidence suggesting that the marijuana had just been put in the crib, a reasonable inference could also be drawn that the bud had been in the crib while the child slept.

■ {11} With respect to the danger to the children, the Court of Appeals discounted

the testimony of Kelly. Noting that no objection had been made to Kelly's testimony, the Court nonetheless determined that Kelly's testimony was inadmissible and "that inadmissible testimony to which no objection is made has only such probative value as its rational persuasive power." *Graham,* 2003–NMCA–127, ¶ 21, 134 N.M. 613, 81 P.3d 556. Irrespective of its admissibility, we believe that the Court of Appeals applied an incorrect standard in reviewing Kelly's testimony. For the proposition that it could weigh Kelly's testimony, the Court of Appeals relied on *State v. Vigil,* 97 N.M. 749, 752, 643 P.2d 618, 621 (Ct.App.1982). We believe the Court of Appeals' reliance on *Vigil* is misplaced. In *Vigil,* the testimony at issue was hearsay, and it was admissible, despite the existence of an objection by the defendant, because, as a probation revocation, the proceeding was not governed by the Rules of Evidence. *Id.* at 750–51, 643 P.2d at 619–20. The question on appeal was whether hearsay alone could establish a probation violation. *Id.* at 751, 643 P.2d at 620. Under these circumstances, the Court assessed the rational persuasive power of the testimony. *Id.* at 752, 643 P.2d at 621. This evaluation of the weight of testimony has similarly been restricted to hearsay serving as the sole evidence supporting a verdict in other cases. *See State v. Romero,* 67 N.M. 82, 86, 352 P.2d 781, 783 (1960) (noting that "hearsay, admitted without objection, is to be considered along with other evidence in determining whether there is substantial evidence to sustain a verdict on appeal"). Outside this limited context, and for non-hearsay such as Kelly's testimony, we follow the rule that

> [w]e do not ... substitute our judgment for that of the factfinder concerning the credibility of witnesses or the weight to be given their testimony. Testimony by a witness whom the factfinder has believed may be rejected by an appellate court only if there is a physical impossibility that the statements are true or the falsity of the statement is apparent without resort to inferences or deductions.

*Sanders,* 117 N.M. at 457, 872 P.2d at 875 (citation omitted).

{12} In addition to Kelly's testimony, Officer Wilder testified that the bud is the part of the marijuana plant containing the highest concentration of tetrahydrocannabinols. We also note that the Legislature has designated marijuana as a Schedule I controlled substance under NMSA 1978, § 30–31–6(C)(10) (1978), together with LSD, heroin, and numerous other drugs. Moreover, the Legislature has increased the penalties available for distributing controlled substances, specifically including marijuana, to minors as opposed to adults, NMSA 1978, § 30–31–21 (1987), and has increased penalties for distributing controlled substances in the vicinity of minors by creating drug-free school zones, NMSA 1978, § 30–31–22(C) (1990). From these statutes, the Legislature has indicated its determination that marijuana is a dangerous substance, particularly for minors. It is also common knowledge that the same amount of an intoxicant can have a more profound impact on infants and toddlers than on adults or even older children. The Court of Appeals, as an example of the inadequacy of the record in the present case, cited to a case in which an expert testified about the extremely large quantity of marijuana necessary for a lethal dose. *Graham,* 2003–NMCA–127, ¶ 24, 134 N.M. 613, 81 P.3d 556. However, Section 30–6–1(D)(1) proscribes conduct that may endanger the health, as well as the life, of a child. It was thus unnecessary for the State to show that the amount of marijuana accessible to the children could have been fatal. Given the illegality of the substance and the Legislature's determination that the substance is particularly dangerous to minors, we believe it was within the jurors' experience to decide whether the amount of accessible marijuana endangered the health of a three-year-old child and a one-year-old child.

{13} Contrary to the applicable standard of review, it appears that the Court of Appeals parsed the testimony and viewed the verdict only in light of the probative value of individual pieces of evidence. The Court of Appeals stated that "Kelly's testimony takes on significance far beyond what it should," *Graham,* 2003–NMCA–127, ¶ 26, 134 N.M. 613, 81 P.3d 556, that "[t]he rational persuasive power of ... Kelly's testimony

is minimal," *id.* ¶ 21, that "[w]e do not know if the children had access to the marijuana or their proximity to the drugs or drug users," *id.* ¶ 25, and that "[w]e do not know where the children were in relation to the others in the house, or whether the 'roach' that was found resulted from this or earlier smoking." *Id.* This divide-and-conquer approach is not contemplated in appellate review for sufficiency of the evidence. *Cf. United States v. Arvizu,* 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (noting that a totality of the circumstances review for reasonable suspicion supporting an investigative stop is inconsistent with a "divide-and-conquer analysis" that looks at individual facts in isolation). We view the evidence as a whole and indulge all reasonable inferences in favor of the jury's verdict. "An appellate court does not evaluate the evidence to determine whether some hypothesis could be designed which is consistent with a finding of innocence." *Sutphin,* 107 N.M. at 130–31, 753 P.2d at 1318–19. Appellate courts "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson,* 443 U.S. at 326, 99 S.Ct. 2781. We do not search for inferences supporting a contrary verdict or reweigh the evidence because this type of analysis would substitute an appellate court's judgment for that of the jury.

{14} From the evidence in the record, a rational jury could draw reasonable inferences that the marijuana was accessible to the children, that there was a reasonable possibility that the children would come in contact with the marijuana, and that there was a reasonable possibility of danger to the very young children from ingesting the marijuana. In conjunction with this evidence, the jury heard testimony that Defendant trafficked in crack cocaine in close proximity to the children and that Defendant kept a substantial quantity of crack cocaine and marijuana in various places around the house. Defendant also admitted to being responsible for leaving the marijuana in places that the jury could infer were easily accessible to the children. Viewing all of the evidence in the record in a light most favorable to the verdict, we determine that a rational jury could find each element of child abuse, including a reasonable possibility of danger to the health of the children, beyond a reasonable doubt.

## IV. Conclusion

{15} We conclude that Defendant's conviction of child abuse is supported by sufficient evidence in the record. We reverse the Court of Appeals and affirm the conviction.

{16} **IT IS SO ORDERED.**

WE CONCUR: PETRA JIMENEZ MAES, Justice, EDWARD L. CHÁVEZ, Justice (specially concurring), RICHARD C. BOSSON, Chief Justice (dissenting), and PAMELA B. MINZNER, Justice (dissenting).

CHÁVEZ, Justice (specially concurring).

{17} I concur with the opinion authored by Justice Serna. I write separately to address some of the concerns raised in the dissenting opinion.

{18} In order to prove the offense of child abuse under Section 30–6–1(C)(1), the State must prove beyond a reasonable doubt that Defendant knowingly, intentionally or negligently, and without justifiable cause, permitted a child to be placed in a situation that may endanger the child's life or health. NMSA 1978, § 30–6–1(D) (2001). In child abuse cases, we have held that the Legislature intended the phrase "may endanger" to constitute "a reasonable probability or possibility" that the child will be endangered. *State v. Ungarten,* 115 N.M. 607, 609, 856 P.2d 569, 571 (Ct.App.1993). In this case the jury was instructed that the State had the burden of proving beyond a reasonable doubt that Defendant caused a child or children to be placed in a situation which endangered their life or health. UJI 14–604 NMRA 2005.

{19} In my opinion, although this is a close case, the evidence was sufficient to support the conviction. I do not agree with the dissent that by sustaining this conviction we make bad parenting a crime. This is not simply a case of bad parenting or a "mistake"

as characterized by the dissent. In this case two children, ages one and three, were running around the house while adults smoked marijuana rolled in cigar paper. A marijuana cigarette bud was left on the floor where the children were playing. An open bag with marijuana residue was left sitting on a table. Marijuana seeds and stems were left on a dresser in the room where the baby crib was located. In the baby crib was a marijuana bud, which, according to expert testimony, is the most potent part of the marijuana plant. The case would have been much stronger had a witness testified that the children were chewing the marijuana left within their reach and had a toxicologist testified regarding the toxicity of marijuana. However, in this case the law does not require such direct evidence. *See State v. McGruder*, 1997–NMSC–023, 123 N.M. 302, 940 P.2d 150. Given the jury's reasonable inference in this case that the marijuana bud, a particularly potent and illegal substance, could harm a child if ingested, I believe the evidence of marijuana left in the baby's crib and the areas where the children were playing is sufficient to support a finding of a reasonable probability or possibility that the children would be endangered.

{20} I am also not persuaded by the concern expressed in the dissent that the Court's holding criminalizes leaving household products accessible to children. Each of the products to which the dissent refers is legal. I do not read Justice Serna's opinion as prohibiting legitimate acts. Additionally, toxic household products have child resistant caps. The Defendant in this case left the marijuana accessible to children without taking any steps whatsoever to eliminate or minimize the risk that the children would ingest the marijuana. A reasonable fact finder could find that such an act constitutes child abuse as defined by the Legislature.

{21} Finally, the dissent relies on *State v. Trujillo* as support for the proposition that a child must be directly in harm's way to support a conviction of child abuse. Much like the dissent in this case, *Trujillo* seems to require proof of actual injury beyond all doubt. In *Trujillo* the Court of Appeals reversed a jury finding of child abuse, holding there was insufficient evidence that a child who witnessed the beating of her mother faced a "substantial risk" to her emotional or physical health. 2002–NMCA–100, ¶¶ 20–21, 132 N.M. 649, 53 P.3d 909. In that case, the drunken father came home late one night, and, as the children slept, he began to beat his wife. The beating was loud enough to awaken the couple's eight-year-old child, who went to the room to see what was happening. The child testified that she saw her dad beating her mother as the mother asked him to stop. When the child appeared at the door the father stopped beating the child's mother and said to the child, "Get your little f___-ing ass back to bed because I don't want to have you see me kill your mother." *Id.* ¶ 5. The Court of Appeals held there was insufficient evidence for a jury to find a "reasonable probability or possibility" that the daughter's emotional health was endangered, *id.* ¶ 20, despite testimony from the child and the mother that the child was scared and saddened by what she witnessed, and that for some time the child lived in fear that she would be "taken away," or that her father would injure her or kill her mother, to the extent that she missed many days of school. *Id.* ¶¶ 11–12. The dissent in this case underscores the lack of evidence of direct, physical harm to the child in *Trujillo*, emphasizing that "the father ordered his child to leave the room just so she would *not* be in the direct line of his anger." ¶ 31. In my opinion, requiring this type of evidence to sustain a jury finding of child abuse goes well beyond requiring the prosecution to prove each element of a crime beyond a reasonable doubt.

{22} Justice is a community project in which individuals participate directly when serving on a jury. While it is certainly appropriate in some cases to reverse a jury conviction based on insufficient evidence, this is not the case. The jury was instructed in such a way that what may be a vague and overbroad statute—requiring only a showing that a child was negligently placed in a situation that may have endangered the child—in fact required a showing that the child was placed in a situation which endangered the child's life. For the reasons previously stated, I believe a reasonable jury could find the

defendant guilty based on the direct and circumstantial evidence presented to the jury and the reasonable inferences that could be drawn from such evidence.

{23} If our interpretation of legislative intent is incorrect as it relates to child abuse, let us err on the side of the safety of children. If the Legislature did not intend for the child abuse definition to reach the circumstance in which illegal drugs are placed within reach of children, the Legislature should revise the definition and tighten up what may be a vague and overbroad statute.

{24} For the foregoing reasons, I concur in affirming Defendant's conviction for child abuse.

BOSSON, Chief Justice (dissenting).

{25} I do not believe the State provided sufficient evidence at trial that the children were actually in danger of ingesting marijuana, and therefore I respectfully dissent. To establish a claim of child abuse, the State must demonstrate that the defendant caused the children "to be placed in a situation which endangered [their] life or health." UJI 14–604 NMRA 2005. The State must first show that marijuana is a potentially dangerous substance, and then that the children were actually in danger from it.

{26} Because most of the trial focused on the other charges arising from Defendant's drug dealing, the one count dealing with child abuse received little attention at trial from either side. The State presented only one theory for the charge in its opening statement: that Defendant committed child abuse by leaving the marijuana in areas accessible to children. *State v. Graham,* 2003–NMCA–127, ¶ 19, 134 N.M. 613, 81 P.3d 556. But it has never been a crime, before now, to leave a potentially toxic chemical in an area where there is only a mere possibility, however remote, that a child might come in contact with it. This cannot be what the legislature had in mind when it made criminal child abuse a third degree felony. Otherwise, we risk criminalizing huge territories of benign, though perhaps careless, conduct

which up to now has been the province of the abuse and neglect statutes or the law of civil negligence. *See* NMSA 1978, § 30–6–1 (2004). We risk making a criminal act out of merely being a bad parent.

{27} I agree with our Court of Appeals that the State presented an anemic case in support of the child abuse charge. Despite the testimony of a police officer formally trained in the identification and handling of marijuana, and a forensic chemist from the state crime lab, the State failed to elicit any expert testimony describing the toxicity of the two small pieces of marijuana or directly linking such a small amount to its potential effects upon small children. Presumably, the State could have done so without undue inconvenience, and the jury would have had the kind of evidence it deserved to make an informed decision.

{28} However, this satisfies only half the State's burden. Beyond proving the degree of risk to the child's health from marijuana generally, the State had to prove proximity: that a child was actually placed in a direct, physical line to that danger.[1] The danger to this particular child must be more than merely theoretical. Although the law does not require that a child suffer actual injury, it does require that the hazard be greater than a "mere possibility." *State v. Ungarten,* 115 N.M. 607, 856 P.2d 569 (Ct.App.1993). The risk of harm has to be substantial; the legislature did not intend to criminalize every harm that might possibly come a child's way. *State v. Massengill,* 2003–NMCA–024, ¶¶ 43–47, 133 N.M. 263, 62 P.3d 354. Our courts have previously lent such a reasonable interpretation to the child abuse statute, and I believe we should do so here. "In making this offense a third degree felony, the legislature intended to address conduct with potentially serious consequences to the life or health of a child. The coupling in the statute of the word 'health' with the word 'life' suggests to us that the legislature intended to address situations in which children are exposed to a substantial risk to their health." *State v. Trujillo,* 2002–NMCA–100, ¶ 21, 132 N.M. 649, 53 P.3d 909.

---

1. Even with the presumed toxicity of marijuana, and fully recognizing its illegality, the State nonetheless had the burden of producing evidence of proximity.

{29} With this caution in mind, I would point out what is self-evident about modern households. They contain a wide assortment of commonly used agents, potentially toxic to children, such as detergents, paint products, cleansers and bleaches, insecticides, herbicides, and even alcoholic beverages and cigarettes. Most of the time, these toxic agents are not under lock and key. Sensibly, as a society we place a considerable degree of trust and discretion in parents; we trust them to undertake reasonable precautions to keep these toxic agents away from children. We do not make a criminal act out of merely making a mistake; after all, none of us is a perfect parent.

{30} In interpreting the child abuse statute, our courts have recognized the distinction between imminent danger and danger which is more remote. For example, we have upheld child abuse convictions when the violent behavior of adults places children physically proximate to that violence and directly in harm's way. *See State v. McGruder*, 1997–NMSC–023, ¶ 38, 123 N.M. 302, 940 P.2d 150 (upholding child abuse conviction despite the lack of any physical harm when defendant aimed a gun at a woman and threatened to kill her while her daughter was standing behind her); *Ungarten*, 115 N.M. at 609–10, 856 P.2d at 571–72 (upholding child abuse conviction when defendant's knife thrusts at a child's parent came close to the child). In these cases, the evidence demonstrated that children were physically close to an inherently dangerous situation.

{31} On the other hand, our courts have reversed child abuse convictions when a child may be in the general area of a potentially dangerous situation, but the child is not placed directly in harm's way. For example, in *State v. Roybal*, 115 N.M. 27, 29, 846 P.2d 333, 335 (Ct.App.1992), a father sold illegal drugs, itself a dangerous proposition, while his daughter waited in the car about ten to fifteen feet away. On appeal from a conviction for child abuse, the court reversed, finding insufficient evidence that the child's mere presence in the car put her sufficiently at risk to constitute criminal child abuse. *Id.* at 34, 846 P.2d at 340. Similarly, in *Trujillo*, 2002–NMCA–100, ¶ 7, 132 N.M. 649, 53 P.3d 909, a father was convicted of child abuse after his daughter witnessed the father's attack upon her mother from the bedroom doorway out of the direct line of danger. Oddly, the father ordered his child to leave the room just so she would *not* be in the direct line of his anger. *Id.* ¶ 5. Again, the court reversed, finding that any risk of danger was physically remote. *Id.* ¶ 19.[2]

{32} Defendant's case is similar to both *Trujillo* and *Roybal*. Even though Defendant introduced a potentially dangerous, illegal substance into the house, Defendant has already been convicted of possession and trafficking. With respect to the separate offense of child abuse, the State failed to demonstrate that either child was ever close enough to the marijuana to be seriously at risk.[3] At trial, the State presented no evidence that these children were ever in the crib with the marijuana bud or even in the same bedroom. In fact, there was very little evidence linking either piece of marijuana to the physical location of the children. The only indication from the record regarding the children's whereabouts is that they were running around the house, not in the bedroom with the crib, at approximately 5:30 p.m., shortly before Defendant's arrest. When the house was secured and officers awaited a search warrant, the children were most likely outside the house with their mother. For all we know, Defendant placed the marijuana bud in the crib earlier in the day, and we have no idea if the children were ever actually in the crib at the same time as the contraband.

2. The special concurrence implies a certain dissatisfaction with the Court of Appeals opinion in *Trujillo*. Yet *Trujillo* was and is the law of this State. This Court had the opportunity to review it on certiorari, yet declined, to do so. The present majority opinion makes no change in *Trujillo*.

3. As the majority opinion correctly states, Defendant took full responsibility for the presence of the marijuana in the house and its location. However, Defendant never conceded its proximity to the children, nor was there any other direct evidence of its actual proximity to the children in terms of place and time.

{33} Importantly, there was no evidence that the children were ever left unsupervised by their mother. In fact, to make one of these children physically proximate to the marijuana in the crib, an adult would have to pick up the child, place the child in the crib, and then leave the child unsupervised in the crib with the marijuana bud. But the mother, not Defendant, was the parent in the house with her children, and there is no evidence that she would likely have been so careless. This does not absolve Defendant of blame or otherwise excuse his reprehensible behavior toward these children. But it does absolve Defendant of guilt under this particular child abuse statute, because the evidence does not prove the elements of the crime established by our legislature.

{34} More significantly, I fear the implications of this opinion with respect to what the legislature has defined as criminal child abuse. If we are going to convict based on nothing more than speculation as to what might have happened if certain events had occurred in the future, then there are almost no limits to what a jury might conclude is child abuse. But juries do not define crimes; the legislature does. And our legislature required evidence of "endangerment," which, under our existing case law, means something more than "what might have been."

{35} Under its broad reading of the statute, the majority is effectively allowing the jury to usurp the role of the legislature in determining what constitutes child abuse. I cannot agree to such a standard-less, open-ended reading, especially of a criminal statute. I especially fear the due process implications to which we give rise with such an unprecedented reading of our child abuse law. Accordingly, with respect, I am compelled to dissent.

I CONCUR. PAMELA B. MINZNER, Justice.